USDC SCAN INDEX SHEET










MNA     5/7/03    14:41
3:03-CR-01281   USA V. MOORE
*1*
*CRINFO.*

1  CAROL C. LAM
   United States Attorney
2  STEVEN A. PEAK
   Assistant U.S. Attorney
3  California State Bar No. 106162
   PATRICK M. DONLEY
4  Senior Litigation Counsel
   Fraud Section, Criminal Division
5  United States Department of Justice
   RONALD D. SMETANA
6  Special Assistant U.S. Attorney
   Federal Office Building
7  880 Front Street, Room 6293
   San Diego, California 92101-8893
8  Telephone: (619) 557-6932

9  Attorneys for Plaintiff
   UNITED STATES OF AMERICA



FILED
MAY - 6 2003
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) Criminal Case No. |
| --- | --- |
| Plaintiff, | ) '03 CR 1281 J |
| v. | ) INFORMATION |
| EMMETT ELLSWORTH MOORE, JR., | ) Title 18, U.S.C., Sec. 371 - Conspiracy to Commit Securities Fraud (Felony); Title 15, U.S.C., Sec. 78j(b), 78ff and 17 C.F.R. Sec. 240.10b-5 - Securities Fraud (Felony); Title 18, U.S.C., Sec. 1341 - Mail Fraud (Felony); Title 18, U.S.C., Sec. 1343 - Wire Fraud (Felony); Title 18, U.S.C., Sec. 1957 - Engaging in Monetary Transactions in Criminally-Derived Property (Felony); Title 26, U.S.C., Sec. 7203 - Failure to File Tax Return (Misdemeanor); Title 18, U.S.C., Sec. 982(a)(1) and 1957 - Criminal Forfeiture; Title 18, U.S.C., Sec. 2 - Aiding and Abetting |
| Defendant. | |

The United States Attorney charges:

//
//
//
//

SAP:San Diego (Moore Info - 050103 (R).wpd)

1

## Count 1

[Title 18, U.S.C., Sec. 371]
(Conspiracy to Commit Securities Fraud)

### The Relevant Parties and Entities

1. Except as otherwise noted, at all times relevant to this Information:

    a.    Progressive Financial, Inc. (hereinafter "Progressive Financial"), a Delaware corporation, was a company controlled by three promoters who operated from a headquarters located at 429 Santa Monica Boulevard, Suite 340, Santa Monica, California 90401. The promoters designed, developed and marketed to the public the opportunity to purchase investment contracts and located and recruited telemarketers to sell the investment contracts. Assisting the promoters were various administrative personnel, including an accountant, an office manager and clerical staff. Also located at the corporate office was an in-house sales force, consisting of several experienced telemarketers. The promoters wrote and disseminated brochures, sales scripts, and other standardized promotional and marketing materials used to induce consumers to buy the investment contracts.

    b.    In addition to its in-house sales force, Progressive Financial recruited and used numerous independent sales offices, sometimes called ISOs or boiler rooms, to sell the investment contracts. The telemarketers in the boiler rooms used the standardized promotional and marketing information and materials developed and provided to them by the promoters at the corporate headquarters. Progressive Financial had boiler rooms in several states, including Colorado, Florida and California. One of the boiler rooms in the Southern District of California was Top Broker, (hereinafter "Top Broker") located in San Diego, California. Abacus Financial, Inc., Omega Financial Group, Top Broker, Commercial Funding Group, Nova, Inc., Preferred Investments, Ltd., Tican International, and The Strandway Group were some of Progressive Financial's other boiler rooms located in the Southern District of California (hereinafter "the other Southern District of California boiler rooms").

    c.    Progressive Financial partnered with Creative Entertainment Group, Inc. (hereinafter "CEG"), a California corporation. CEG was responsible with Progressive Financial for the

purchase of media air time, the selection of products for advertisement for sale on the media air time, the selection of territories, the establishment of merchandise sale accounts, the production of product commercials, the determination of product pricing, and the arrangements with product owners, fulfillment companies and shipping services. Progressive Financial and CEG conducted business in the name of Commercial Express LLC (hereinafter "Commercial Express"), a California limited liability company.

  d. EMMETT ELLSWORTH MOORE, JR. (hereinafter "MOORE, JR.") was an operator and manager of Top Broker which sold investment contracts on behalf of Commercial Express.

<u>Background</u>

2. Under federal law, "telemarketing" refers to a plan, program, promotion, or campaign to induce purchases of goods, services, including investment contracts, by use of one or more interstate telephone calls initiated by the person who tries to induce the purchase. Under federal and California securities law, a "security" includes an investment contract, which is a contract, transaction or scheme whereby a person invests money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party. Sales of investment contracts are often telemarketed through boiler rooms, using scripts known as "pitch sheets" designed to be read over the telephone to a potential investor. Boiler rooms are required to be registered with the California Attorney General and copies of promotional and marketing materials, such as pitch sheets, must be filed with the State.

3. Sales of investment contracts are conducted by a company's in-house sales force or by boiler rooms. In many instances sales are made by a combination of a fronter and a closer. A "fronter" is the person who has made the initial phone call with a prospective purchaser whose personal information has been supplied as a "lead." The fronter, using a pitch sheet, tries to "qualify" the "lead" by obtaining sufficient information to determine the purchaser's financial condition and likelihood of making a purchase. After the fronter has qualified the purchaser, a more experienced salesperson, called a "closer," takes over and attempts to persuade the purchaser to invest, using arguments and statements, often called "rebuttals," designed to address a

1 | purchaser's skepticism about the investment. Closers are paid commission rates based on the gross amount of the sale.

4. A "Ponzi scheme" is a fraudulent arrangement in which investors or participants are attracted by the lure of exorbitant profits they may make. The operators of the Ponzi scheme maintain and promote this idea by paying seemingly large profits to early investors from money obtained from later investors, rather than from any profits or commissions earned by the underlying business venture. The fraud consists of funneling the money received from new investors to previous investors leading the previous investors to believe that the money is profit or commission from the business venture itself. In this manner, the scheme operators create the illusion that a legitimate profit-making business opportunity exists which, in turn, may attract either new investors or repeat purchases from early investors, called "reloads."

## The Conspiracy

5. Beginning in or about June 1997 and continuing to an unknown date, but at least until September 21, 1998, in the Southern District of California and elsewhere, defendant EMMETT ELLSWORTH MOORE, JR., knowingly combined, conspired and agreed with others known and unknown, to commit securities fraud, by using the mails and other means and instrumentalities of interstate commerce, and by knowingly, willfully, and unlawfully (a) using a device, scheme and artifice to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated as a fraud and deceit upon persons in connection with the purchase and sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and 17 Code of Federal Regulations Section 240.10b-5.

## The Scheme and Artifice to Defraud and the Manner and Means Used to Execute It

6. It was a part of the scheme and artifice to defraud and among the manner and means used to execute it that:

a. Joel Alan Fein (charged elsewhere) and Timothy McNeill Hazzard (charged elsewhere) and another, as officers of Progressive Financial and promoters of Commercial Express, and their coconspirators created and operated Commercial Express to offer to the public the opportunity to purchase "Media Units" for the amount of $5,000 or $10,000 per unit or "Equity Participations" for a minimum investment of $100,000. A Media Unit purported to be a purchase of a minimum of eighty (80) up to one hundred (100) media broadcast spots with the investor to profit from the gross revenues from product sales generated from direct response commercials whose media buys were funded from those units. An Equity Participation purported to be an ownership interest in Commercial Express with participation in the business' worldwide profits. The Media Units and Equity Participations constituted investment contracts and securities within the meaning of federal and state securities laws;

b. Commercial Express entered into contracts with a number of boiler rooms, including Top Broker and the other Southern District of California boiler rooms, to market Media Units and Equity Participations to the public in exchange for up to a fifty percent (50%) commission on each sale. The promoters of Commercial Express would share in the commissions earned by the boiler rooms and their employees;

c. at least fifty-five percent (55%) of all funds invested were paid out as commissions. From this fifty-five percent (55%), the boiler rooms, excluding Top Broker, were paid their commissions and the remainder was paid to the officers of Progressive Financial and promoters of Commercial Express and other coconspirators;

d. Commercial Express paid only a fraction of the money received from the sale of these Media Units to buy television time to air direct response commercials to advertise and sell a number of different products, and Commercial Express promised to share the profits from the sale of these products with the purchasers of the Media Units and Equity Participations. In addition, they falsely claimed that an investor would receive a return of up to twenty-six percent (26%) per quarter from the sale of products. They also claimed that the money received from the sale of the Equity Participations would give investors an ownership interest in Commercial Express, and misled investors into believing that there were adequate revenues to make future distributions; and

5

e.  Commercial Express and its boiler rooms, including Top Broker and the other Southern District of California boiler rooms, marketed Media Units and Equity Participations as legitimate business investments, when in fact, defendant MOORE, JR. and coconspirators, known and unknown, were operating a Ponzi scheme. The Ponzi scheme involved selling Media Units and Equity Participations while falsely representing that the money received from those sales would be used to buy television time to air direct response commercials to advertise and sell products that would generate profits for the investors, when in fact, Commercial Express spent only small amounts to buy television time, had only minimal product sales and no profits, and was using the money received from later investors to pay earlier investors and its own overhead and expenses, including the commissions paid to the boiler rooms.

9. It was further part of the scheme and artifice to defraud and among the manner and means used to execute it that defendant MOORE, JR. and coconspirators, known and unknown, knowingly made and caused to be made, various false and fraudulent pretenses, representations and promises, orally during interstate telephone calls and in written materials delivered by the United States mail and by private commercial interstate carrier, to induce potential investors to purchase Media Units and Equity Participations. These false and fraudulent pretenses, representations and promises included, but were not limited to, the following:

a.  that Commercial Express was a successful company that had been in the business of creating commercials and sales campaigns for products for several years;

b.  that Commercial Express had the clients and products, past and present, listed in the offering brochures;

c.  that the money that Commercial Express received from the sale of each Media Unit would be used to (1) locate products and acquire the rights to sell them, (2) make direct response commercials, and (3) buy television time for the commercials for products including, but not limited to, the "Hydrator" (water-filled wrist weights); "Miracle Mat" (absorbs spills); "Hair Doodle" (pony tail holder); "Plug N Start" (starts a car with a dead battery); "Ultra Arms" (arm exercise device); "Winning the Game of Credit" (credit repair); "Socket Sensor" (electric eye for

//

light fixtures); "Sonic Mosquito Repeller" (repels mosquitos with sound); and "LDDI" (discounted long distance telephone service);

    d.    that successful sales tests had been conducted on Commercial Express' products;

    e.    that each investor would be provided a separate third-party accounting of the products sold and revenues received in their chosen market;

    f.    that each investor would receive a concise list of all products and commercial options and media buys, and a final tabulation of all sales reports showing the proceeds from product sales relating to media buys;

    g.    that Commercial Express would consult with each investor to choose products and buy media time to promote and induce the sale of products through direct response commercials and media;

    h.    that a Media Unit was the purchase of a minimum of eighty (80) up to one hundred (100) media broadcast spots with the investor to profit from the gross revenues from sales generated from direct response commercials whose media buys were funded from those units;

    i.    that Media Units would be utilized for media buys which would be distributed among ten (10) to fifteen (15) cities known as territories;

    j.    that investors would receive proportionally the first $5.50 up to $11.00 from all products sold from chosen territories over a 90-day period, with such income calculated before other expenses and fees incurred have been paid;

    k.    that an investor would receive a ten percent (10%) to twenty-six percent (26%) return every 90 days; and

    l.    that Commercial Express had met its projections and had made distributions to earlier investors from the profit on its product sales.

10. It was further part of the scheme and artifice to defraud and among the manner and means used to execute it that defendant MOORE, JR. and coconspirators, known and unknown, knowingly, intentionally and deceitfully concealed and omitted material facts relating to the true nature of the business of Commercial Express from information provided to potential purchasers of Media Units and Equity Participation orally during interstate telephone calls and in written

materials delivered by the United States mail and by private commercial interstate carrier, to induce them to invest with Commercial Express. The material facts knowingly, intentionally and deceitfully concealed and omitted included, but were not limited to, the following:

  a. that earlier investors were being paid money that was generated solely from sales of Media Units and Equity Participations to later investors, rather than from product sales;

  b. that the scheme relied on the continued recruitment of new investors to generate the money paid to earlier investors;

  c. that the majority of the funds invested were used to pay commissions and overhead;

  d. that Commercial Express boiler rooms, including Top Broker and the other Southern District of California boiler rooms, were retaining or being paid up to a fifty percent (50%) commission for the sale of each Media Unit or Equity Participation;

  e. that Commercial Express was obligated to sell a minimum number of products to keep the rights to sell these products;

  f. that Commercial Express failed to sell a sufficient number of products to keep the rights to sell these products;

  g. that only a minimal number of products had actually been sold as a result of television advertising;

  h. all risks factors associated with investing in Media Units and Equity Participations;

  i. the information contained in Commercial Express' financial statements;

  j. that Commercial Express was the subject of a Summary Order to Cease and Desist issued by State of Pennsylvania on March 3, 1998;

  k. that Commercial Express was the subject of an Order to Cease and Desist issued by the State of South Dakota on May 27, 1998;

  l. that Commercial Express and its operations were being investigated by the Securities and Exchange Commission and the Federal Trade Commission;

  m. that one or more of the promoters of Commercial Express had been subject to adverse federal and state regulatory action for the sale of unregistered securities and fraud;

//

n. that one or more of the promoters of Commercial Express had been subject to adverse action by the National Association of Securities Dealers as a result of investment-related wrongdoing; and

o. that Media Units and Equity Participations, as investments granting the purchaser the right to earn income from the efforts of others, constituted securities under federal and state law and had not been registered with the Securities and Exchange Commission or the State of California.

11. It was further part of the scheme and artifice to defraud and among the manner and means used to execute it that defendant MOORE, JR. and coconspirators, known and unknown, sent and caused to be sent to investors and potential investors eight newsletters that falsely represented, among other things, that Commercial Express was meeting or exceeding its projected product sales.

12. It was further part of the scheme and artifice to defraud and among the manner and means used to execute it that defendant MOORE, JR. and coconspirators, known and unknown, knowingly made and caused to be made, various false and fraudulent pretenses, representations and promises, orally during interstate telephone calls and in written materials delivered by the United States mail and by private commercial interstate carrier, to induce potential investors to purchase Media Units and Equity Participations. These false and fraudulent pretenses, representations and promises included, but were not limited to, falsely advising Top Broker Media Unit investors that their investments would be pooled together with those of other Top Broker investors so as to allow the group to have a sufficiently large investment that they would qualify as Equity Participants in Commercial Express and receive larger returns.

13. It was further part of the scheme and artifice to defraud and among the manner and means used to execute it that one of the principals of Commercial Express advised a California attorney employed by defendant MOORE, JR. and Top Broker (hereinafter "Top Broker's attorney" or "its attorney") that the attorney would be allowed to become an Equity Participant in Commercial Express for an investment of not less than $100,000.

//

14. It was further part of the scheme and artifice to defraud and among the manner and means used to execute it that defendant MOORE, JR. and his telemarketers advised Top Broker investors to make checks payable to its attorney and to mail those checks to the attorney at 1550 Sixth Ave., Suite 1000, San Diego, California 92101-6143. Investors were falsely told that its attorney would deposit their checks into the attorney's "Legal Trust" account and retain the proceeds on their behalf until a sufficient amount had been obtained to allow for the purchase of one or more Equity Participations. For serving as an agent for Top Broker, its attorney was to receive 10% of all money taken in from Top Broker investors. The total amount received by defendant MOORE, JR. and Top Broker from investors who invested through Top Broker was approximately $468,060.

15. It was further part of the scheme and artifice to defraud and among the manner and means used to execute it that on or about June 8, 1998, Top Broker withdrew $100,000 from its attorney's trust account in the form of two cashier's checks and converted those checks into a single cashier's check. Defendant MOORE, JR. caused a family member and Top Broker's attorney to deliver that $100,000 check to Commercial Express at its 429 Santa Monica Blvd., Suite 340, Santa Monica, California office. The officers of Progressive Financial and promoters of Commercial Express initially accepted the check as payment for an Equity Participation. On or about July 2, 1998, Commercial Express terminated Top Broker as a sales office, and on or about July 7, 1998 returned the $100,000 to Top Broker on the basis that the pooling arrangement employed by Top Broker was contrary to Commercial Express policy.

16. It was further part of the scheme and artifice to defraud and among the manner and means used to execute it that Top Broker and defendant MOORE, JR. returned the $100,000 to the Top Broker investors as a pro rata return of their investment. This return constituted only approximately 20% of the $468,060 invested. In returning some of the investment money to its investors, Top Broker and defendant MOORE, JR. knowingly made and caused to be made, various false and fraudulent pretenses, representations and promises, orally during interstate telephone calls and in written materials delivered by the United States mail and by private commercial interstate carrier, including, but not limited to the following:

//

a. that Top Broker had reclaimed the $100,000 given to Commercial Express because they discovered there may have been problems with the rates of return on the investments promised by Commercial Express;

b. that Top Broker had received $187,200 from the funds paid into the trust account of its attorney as its commissions, but that they disputed his claim for $167,000 in attorney's fees;

c. that Top Broker had demanded that its attorney return to the investors, on a pro rata basis, all the money the attorney held, but that its attorney had refused to do so; and

d. that Top Broker intended to sue its attorney to recover the money on behalf of Top Broker investors and would otherwise do everything in their power to restore the investors' money.

17. It was further part of the scheme and artifice to defraud and among the manner and means used to execute it that Top Broker and defendant MOORE, JR. would not and did not use $368,000 remaining in its attorney's trust account to buy Media Units or Equity Participations on behalf of the investors. Rather, Top Broker and defendant MOORE, JR. used over $200,000 to promote their scheme, including paying themselves and their salespersons commissions and salaries. Top Broker's attorney kept more than $165,000 as his fees for serving as trust account agent.

## Overt Acts

18. In furtherance of the conspiracy and to effect the objects thereof, the following overt acts, among others, were committed within the Southern District of California, and elsewhere, with each transaction constituting a separate overt act:

a. On or about March 25, 1998, George Otis of Laurel, Maryland sent a personal check payable to Top Broker's attorney's trust account (#******8683) in the amount of $20,000 for the purchase of a Commercial Express Media Unit to be pooled with others via private commercial interstate carrier to Top Broker, 2707 Garnet Street, Suite 2000, San Diego, California 92109

b. On or about March 30, 1998, one of the principals in Commercial Express wrote to Top Broker's attorney that he would be allowed to become an Equity Participant in Commercial Express for an investment of not less than $100,000;

c. On or about April 3, 1998, Linda and Ronald Wardell of Virginia Beach, Virginia sent a check payable to Top Broker's attorney's trust account (#******8683) in the amount of

11

$5,000 for the purchase of a Commercial Express Media Unit to be pooled with others via private commercial interstate carrier to Top Broker, 2707 Garnet Street, Suite 2000, San Diego, California 92109;

  d. On or about April 16, 1998, Norman Carpenter of Harrisonburg, Virginia sent a personal check payable to Top Broker's attorney's trust account (#******8683) in the amount of $5,000 for the purchase of a Commercial Express Media Unit to be pooled with others via the U.S. Mail to Top Broker's attorney at 1550 Sixth Avenue, Suite 1000, San Diego, California, 92101-6143;

  e. On or about April 22, 1998, Gary Chaffee of Muskegon, Michigan sent a personal check payable to Top Broker's attorney's trust account (#******8683) in the amount of $10,000 for the purchase of a Commercial Express Media Unit to be pooled with others via private commercial interstate carrier to Top Broker's attorney at 1550 Sixth Avenue, Suite 1000, San Diego, California, 92101-6143;

  f. On or about May 15, 1998, George Otis of Laurel, Maryland sent a personal check payable to Top Broker's attorney's trust account (#******8683) in the amount of $100,000 for the purchase of a Commercial Express Media Unit to be pooled with others via private commercial interstate carrier to Top Broker, 2707 Garnet Street, Suite 2000, San Diego, California 92109;

  g. On or about June 6, 1998, defendant MOORE, JR. caused a family member to sign a sales agreement with Commercial Express on behalf of Top Broker;

  h. On or about June 12, 1998, defendant MOORE, JR. caused a family member and Top Broker's attorney to deliver a cashier's check for $100,000 to Commercial Express which was deposited to Commercial Express account (#******7863) at Union Bank in Woodland Hills, California; and

  i. On or about June 15, 1998, Pauline Black of East Liverpool, Ohio sent a personal check payable to Top Broker's attorney's trust account (#******8683) in the amount of $20,000 for the purchase of a Commercial Express Media Unit to be pooled with others via private commercial interstate carrier to Top Broker, 2707 Garnet Street, Suite 2000, San Diego, California 92109;

j. On or about June 15, 1998, Top Broker sent a letter to Commercial Express acknowledging that the pooling arrangement was unacceptable to Commercial Express;

k. On or about July 2, 1998, Commercial Express notified Top Broker that Top Broker's representation of Commercial Express was being terminated because its pooling of Media Unit purchasers was contrary to Commercial Express policy;

l. On or about July 7, 1998, Commercial Express issued a $100,000 check payable to Top Broker which was converted into a cashier's check and deposited into a Bank of America account (#*****-*6097) controlled by Top Broker;

m. On or about August 29, 1998, Top Broker began sending letters to Top Broker investors falsely advising them of the circumstances under which a small part of their investment was being returned to them; and

n. On or about September 1, 1998, Top Broker transferred $100,000 plus interest from a Bank of America account (#*****-*6097) controlled by Top Broker to another Bank of America account (#*****-*2757), also controlled by Top Broker.

All in violation of Title 18, United States Code, Section 371.

## Count 2

[Title 15, U.S.C., Sec. 78j(b) and 78ff - Securities Fraud]
[Title 18, U.S.C., Sec. 2 - Aiding and Abetting]

19. The factual allegations contained in Paragraphs 1 through 4 and 6 through 17 of Count 1 of this Information are realleged and reasserted as if set forth in full herein.

20. Beginning in or about February 1998 and continuing to an unknown date, but at least until September 1998, in the Southern District of California and elsewhere, defendant EMMETT ELLSWORTH MOORE, JR., using the mails and other means and instrumentalities of interstate commerce, knowingly, willfully, and unlawfully (a) used a device, scheme and artifice to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including those statements and omissions set forth in Paragraphs 8 through 12 and 16 above; and (c) engaged in acts, practices, and courses of business which operated as a fraud and

deceit upon persons in connection with the purchase or sale of securities, that is, Commercial Express Media Units and Equity Participations.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; 17 Code of Federal Regulations Section 240.10b-5; and Title 18, United States Code, Section 2.

## Counts 3 and 4

[Title 18, U.S.C., Sec. 1341 - Mail Fraud]

21. Beginning in or about February 1998 and continuing to and including on or about June 22, 1998, in the Southern District of California and elsewhere, defendant EMMETT ELLSWORTH MOORE, JR. and others known and unknown, knowingly and willfully devised and intended to devise a scheme and artifice to defraud investors and to obtain money from said victims by means of materially false and fraudulent pretenses, representations and promises, and by intentional concealment and omission of material facts.

### The Scheme and Artifice to Defraud

22. The factual allegations contained in Paragraphs 1 through 4 and 6 through 17 of Count 1 of this Information are realleged and reasserted as if set forth in full herein.

23. It was further part of the scheme and artifice to defraud and among the manner and means used to execute it that Commercial Express' investment contracts were sold in connection with the conduct of telemarketing, as defined by Title 18, United States Code, Section 2325.

### Execution of the Scheme by Mail or Private, Commercial Interstate Carrier

24. On or about the dates set forth below, in the Southern District of California, and elsewhere, defendant MOORE, JR. and others known and unknown, for the purpose of executing the aforesaid scheme to defraud, and attempting to do so, knowingly deposited and caused to be deposited to be sent and delivered by the U.S. Mail or by a private commercial interstate carrier, for delivery according to the directions thereon, envelopes containing mail matter, specifically described in Counts 3 and 4 below, with each mailing or delivery constituting a separate violation of Title 18, United States Code, Sections 1341 and 2:

//

//

| Count | Date | Nature of Mailing |
|---|---|---|
| 3 | 05/15/98 | Top Broker caused George Otis of Laurel, Maryland to send a personal check payable to Top Broker's attorney's trust account (#\*\*\*\*\*\*8683) in the amount of $100,000 to be pooled with others for the purchase of an Equity Participation in Commercial Express via private commercial interstate carrier to Top Broker, 2707 Garnet Street, Suite 2000, San Diego, California 92109. |
| 4 | 06/15/98 | Top Broker caused Pauline Black of East Liverpool, Ohio to send a personal check payable to Top Broker's attorney's trust account (#\*\*\*\*\*\*8683) in the amount of $20,000 to be pooled with others for the purchase of an Equity Participation in Commercial Express via private commercial interstate carrier to Top Broker, 2707 Garnet Street, Suite 2000, San Diego, California 92109. |

All in violation of Title 18, United States Code, Sections 1341 and 2, and which were committed in connection with the conduct of telemarketing, as set forth in Title 18, United States Code, Section 2325.

## Count 5-7

[Title 18, U.S.C., Sec. 1343 - Wire Fraud]

25. Beginning in or about February 1998 and continuing to and including on or about June 22, 1998, in the Southern District of California and elsewhere, defendant EMMETT ELLSWORTH MOORE, JR. and others known and unknown, knowingly and willfully devised and intended to devise a scheme and artifice to defraud investors and to obtain money from said victims by means of materially false and fraudulent pretenses, representations and promises, and by intentional concealment and omission of material facts.

### The Scheme and Artifice to Defraud

26. The factual allegations contained in Paragraphs 1 through 4 and 6 through 17 of Count 1 of this Information are realleged and reasserted as if set forth in full herein.

27. It was further part of the scheme and artifice to defraud and among the manner and means used to execute it that Commercial Express' investment contracts were sold in connection with the conduct of telemarketing, as defined by Title 18, United States Code, Section 2325.

### Execution of the Scheme by Wire Communication

28. On or about the dates set forth below, in the Southern District of California, and elsewhere, defendant MOORE, JR. and others known and unknown, for the purpose of executing the aforesaid scheme to defraud, knowingly caused to be transmitted by means of wire

15

communications in interstate commerce, certain signs, signals and sounds as set forth in Counts 5 through 7 below with each interstate communication constituting a separate violation of Title 18, United States Code, Sections 1343 and 2:

| Ct | Date | Nature of the Wire Communication |
|---|---|---|
| 5 | 5/22/98 | Top Broker caused William D. Phelan of Westfield, New Jersey to wire transfer $5,000 from his account at Smith Barney Shearson, Inc. in New York City, New York to Top Broker's attorney's trust account (#******8683) at First National Bank in San Diego, California. |
| 6 | 6/12/98 | Top Broker caused William D. Phelan of Westfield, New Jersey to wire transfer $27,500 from his account at Smith Barney Shearson, Inc. in New York City, New York to Top Broker's attorney's trust account (#******8683) at First National Bank in San Diego, California. |
| 7 | 6/12/98 | Top Broker caused Lois Coleman of Moscow Mills, Missouri to wire transfer $8,060 from her account at NationsBank in Saint Louis, Missouri to Top Broker's attorney's trust account (#******8683) at First National Bank in San Diego, California. |

All in violation of Title 18, United States Code, Sections 1343 and 2, and which were committed in connection with the conduct of telemarketing, as set forth in Title 18, United States Code, Section 2325.

## Counts 8-13

[Title 18, U.S.C., Sec. 1957 - Engaging in Monetary Transactions
in Property Derived from Specified Unlawful Activity]
[Title 18, U.S.C. Sec. 2 - Aiding and Abetting]

29. The factual allegations contained in Paragraphs 1 through 4 and 6 through 17 of Count 1 of this Information are realleged and reasserted as if set forth in full herein.

30. On or about the dates listed below, within the Southern District of California and elsewhere, knowing that the property specified below represented the proceeds of some form of unlawful activity, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78(j) and 78ff and 17 Code of Federal Regulations Section 240.10b-5, mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, defendant EMMETT ELLSWORTH MOORE, JR. and others known and unknown, as set forth below, did knowingly engage in a monetary transaction in criminally derived property of a value greater than $10,000, in the manner indicated below:

16

| Count | Date | Monetary Transaction |
|---|---|---|
| 8 | 06/04/98 | Transfer in the amount of $40,000 (check # 3085) from Top Broker's attorney's trust account (#******8683) at First National Bank in San Diego, California to Top Broker's account (#*****-*2757) at Bank of America in San Diego, California under the control of a family member of defendant MOORE, JR. |
| 9 | 06/08/98 | Transfer in the amount of $100,000 in the form of two cashier's checks from Top Broker's attorney's trust account (#******8683) at First National Bank in San Diego, California to Top Broker which converted them into one cashier's check that was subsequently deposited by Commercial Express to its account (#******7863) at Union Bank in Woodland Hills, California. |
| 10 | 06/18/98 | Transfer in the amount of $24,277 (check #3104) from Top Broker's attorney's trust account (#******8683) at First National Bank, in San Diego, California to Top Broker's account (#*****-*2757) at Bank of America in San Diego, California under the control of a family member of defendant MOORE, JR. |
| 11 | 06/25/98 | Transfer in the amount of $20,250 (check #3112) from Top Broker's attorney's trust account (#******8683) at First National Bank, in San Diego, California to Top Broker's account (#*****-*2757) at Bank of America in San Diego, California. |
| 12 | 07/07/98 | Transfer in the amount of $100,000 (check #1119) from a Union Bank account (#******7863) held in the name Commercial Express to Top Broker which converted it into a cashier's check and deposited it to Top Broker's account (#*****-*6097) at Bank of America in San Diego, California. |
| 13 | 09/01/98 | Transfer in the amount of $100,641.74 from Top Broker's account (#*****-*6097) at Bank of America in San Diego, California to another Top Broker account (#*****-*2757) at Bank of America in San Diego, California. |

All in violation of Title 18, United States Code, Section 1957 and Title 18, United States Code, Section 2.

## Count 14

[Title 26, U.S.C., Sec. 7203 - Failure to File Individual Income Tax Return]

31. During the calendar year 1998, defendant EMMETT ELLSWORTH MOORE, JR. had and received gross income of approximately $84,050. By reason of this gross income, defendant MOORE, JR. was required by law, following the close of the calendar year 1998, and on or before April 15, 1999, to file an income tax return with the Representative of the District Director of the Internal Revenue Service at San Diego, California, or with the Director, Internal Revenue Service Center, at Fresno, California, or other proper officer of the United States, stating specifically the items of his gross income and any deductions and credits to which he was entitled.

32. Well knowing and believing all of the foregoing, defendant MOORE, JR. did willfully fail to timely make said income tax return to the Representative of the District Director of the Internal Revenue Service, to the Director of the Internal Revenue Service Center, or to any other proper officer of the United States.

All in violation of Title 26, United States Code, Section 7203.

## Criminal Forfeiture Allegation

[Title 18, U.S.C., Sec. 982(a)(1) and 1957]

33. The factual allegations contained in Paragraphs 29 and 30 of this Information are incorporated herein as if set forth in full.

34. Defendant EMMETT ELLSWORTH MOORE, JR., if convicted of Counts 8 through 13 of this Information, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, and any property traceable to such offense for which they are jointly and severally liable.

35. If any of the above-described forfeitable property, as a result of any act or omission of defendant MOORE, JR.: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third person; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be subdivided without difficulty, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), made applicable by Title 18, United States Code, Section 982(a)(1), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property.

DATED: May __/__, 2003.

CAROL C. LAM
United States Attorney

*/s/ Steven A. Peak*

STEVEN A. PEAK
Assistant United States Attorney

//
//

18